**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **HCP OF ILLINOIS, INC., d/b/a NAI PARTNERS OF ILLINOIS,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 12 C 10031** |
| **THE FARBMAN GROUP I, INC., a/k/a NAI FARBMAN, 216 JAX LLC,** | ) ) ) | **Magistrate Judge Jeffrey Cole** |
| **Defendants.** | ) ) | |

**MEMORANDUM OPINION AND ORDER**

**INTRODUCTION**

The plaintiff, Housing Choice Partners ("HCP"), is a non-profit organization that helps low income people seeking affordable housing in the Chicago metropolitan area. It was founded in 1995 by metropolitan area fair housing organizations, concerned about the concentrations of poverty and race that had developed in the suburban rent subsidy program (then called Section 8). A significant percentage of its clientele is African-American. The Farbman Group holds itself out as a "leading commercial management and brokerage firm serving a wide variety of individual and institutional clients." www.farbman.com/solutions/overview/.

In June 2012, HCP unsuccessfully attempted to rent space in the Farbman Group's property at 216 W. Jackson in Chicago. Believing that Farbman's rejection was racially motivated, HCP filed suit under 42 U.S.C. §§ 1981 and 1982, and the Illinois Human Rights Act. Section 1981 prohibits discrimination on the basis of race in the making, performing, and modifying of contracts, while Section1982 prohibits discrimination on the basis of race in the sale or rental of property. Because of their common origin in the Civil Rights Act of 1866 and their common purpose, § 1981 and §

1982 are generally construed in tandem. *See Tillman v. Wheaton–Haven Recreation Ass'n, Inc.,* 410 U.S. 431, 439–40 (1973). Intentional discrimination is a key element of a claim under §§ 1981 and 1982, *Kim v. Ritter*, 493 Fed.Appx. 787, 789 (7th Cir. 2012); *Burnell v. Gates Rubber Co.,* 647 F.3d 704, 708 (7th Cir.2011); *Harris v. Warrick County Sheriff's Dep't,* 666 F.3d 444, 447 (7th Cir. 2012), and likewise, under the Illinois Human Rights Act. *De v. City of Chicago*, 912 F.Supp.2d 709, 733 (N.D. Ill.2012).

The Farbman Group and 216 Jax LLC (the "Farbman Group defendants" or "defendants") have moved for summary judgment, arguing that HCP cannot succeed in proving "defendants" discriminatory intent. They point to the denial of Andrew Gutman, the Farbman Group's President, that race played any role in his decision not to lease space to HCP at the 216 W. Jackson Street building. Indeed, he insists that he was not even aware that HCP's clientele was African-American and that he was utterly indifferent to their race. The defendants also point to other evidence that they say conclusively negates HCP's claim that the defendants were racially animated against HCP and its clientele. The plaintiff, of course, has a profoundly different view of the evidence.

What is often overlooked in cases such as this is that discriminatory intent seldom can be proved by direct evidence, since there are obviously no witnesses to a person's uncommunicated thoughts. Thus, while objective facts may be proved directly, "the state of a man's mind must be inferred from the things he says or does....[C]ourts and juries every day pass upon knowledge, belief and intent...having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred." *American Communications Ass'n,*

2

*C.I.O. v. Douds,* 339 U.S. 382, 411 (1950). [1]

The Supreme Court has often acknowledged the utility of circumstantial evidence in discrimination cases. For example, in *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, (2000), the Court recognized that evidence that a defendant's explanation for an employment practice is "unworthy of credence" is "one form of circumstantial evidence that is probative of intentional discrimination." *Id.* at 147. *Cf. Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312, 315 (7th Cir. 2011)(a defendant "who advances a fishy reason takes the risk that disbelief of the reason will support an inference that it is a pretext for discrimination."); *Fischer v. Avande, Inc.*, 519 F.3d 393, 407 (7th Cir. 2008); *Glass v. Dachel,* 2 F.3d 733, 743-44 (7th Cir.1993)(finding defendant's *post hoc* explanation "too fishy" to allow summary judgment).

The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: experience has taught that circumstantial evidence may be more certain, satisfying and persuasive than direct evidence. *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100 (2003); *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960); *United States v. Persfull,* 660 F.3d 286, 294(7th Cir.2011); *Branion v. Gramly*, 855 F.2d 1256 (7th Cir. 1988)(Easterbrook, J.)("The evidence was circumstantial, but what circumstances!").

---

[1] While judges in summary judgment proceedings are not to make credibility determinations, they are not to ignore common sense and human experience. *Hobgood v. Illinois Gaming Bd.*, – F.3d –, –, 2013 WL 3599498, *9 (7th Cir. 2013)(court need not "abandon good reason and common sense in assessing" proffered legitimate excuse). Indeed, common sense and human experience always have a significant role to play in judging and in assessing what inferences may reasonably be drawn from a given set of facts. *See e.g., United States v. Montoya De Hernandez,* 473 U.S. 531, 542 (1985); *University of Pennsylvania v.* E.E.O.C., 493 U.S. 182, 194 (1990); *Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir. 2009); *Greenstone v. Cambex Corp.,* 975 F.2d 22, 26 (1st Cir.1992) (Breyer, C.J.); Posner, How Judges Think, 116 (Harv. Univ. Press 2008). *Cf. Donnelly v. United States,* 228 U.S. 243, 277–78 (1913) (Holmes, J., dissenting)("The rules of evidence in the main are based on experience, logic, and common sense ....").

In short, since discriminatory intent can seldom be proved with direct evidence, wide evidentiary latitude should be granted to those attempting to prove discriminatory intent. *U.S. Postal Service v. Aikens*, 460 U.S. 711, 714 n. 3 (1983). That caution, however, butts up against the inflexible principle that in summary judgment cases, all reasonable inferences are to be drawn in favor of the opponent of the motion.

The plaintiff is indignant at what it perceives to be a blatant case of discrimination. The defendants are incensed at what they deem to be the plaintiff's "slanderous and baseless allegations of race discrimination," which they say have "irreparably tarnished" their reputations. (*Motion for Summary Judgment* at 1). In light of the emotional pitch of the parties' presentations, it is appropriate at the outset to stress that this is a summary judgment proceeding and not a trial, and nothing contained in this opinion should to be construed as expressing any view of the merits of the case. What the evidence has shown, however, is that there are genuine issues of material fact requiring a trial where the jury which will have the benefit of an adversarial, evidentiary presentation in which the witnesses will be subject to cross-examination, and the jury can assess their demeanor -- a critical component of any credibility determination. *See DW Data, Inc. v. C. Coakley Relocation Systems, Inc*., _F.Supp.2d_, 2013 WL 3196937 (N.D.Ill. 2013)(collecting cases)

## ANALYSIS

### I.
### Summary Judgment Standards Under Rule 56, Federal Rules of Civil Procedure and Local Rule 56.1

### A.

The Federal Rules of Civil Procedure mandate that summary judgment be "rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are facts that "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute over material facts is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. To determine whether genuine issues of material fact exist, we ask if "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52. *See also Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC,* 464 F.3d 659, 664 (7th Cir.2006). "Courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion." *Scott v. Harris,* 550 U.S.372, 378 (2007). *See also Adeyeye*, 721 F.3d at 449; *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 694, 397 (7th Cir. 2012). Summary judgment cannot be granted if a genuine issue of material fact exists that would allow a reasonable jury to find in favor of the non-moving party. *Anderson,* 477 U.S. at 249–51; *Forrest v. Prine,* 620 F.3d 739, 742–43 (7th Cir. 2010).

Because HCP has presented sufficient circumstantial evidence to raise genuine issues of

material fact on the question of the motivation underlying the Farbman defendants' refusal to permit HCP to sublease space at 216 W. Jackson, the defendants' motion for summary judgment must be denied.

## B.

"For litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component . . . ." *Sojka*, 686 F.3d at 398. A party moving for summary judgment has to file a statement of facts it thinks entitles it to summary judgment and must support those factual assertions with citations to admissible evidence. Local Rule 56.1(a). The party opposing the motion must respond in kind, with a statement controverting any facts it disagrees with and adding any additional facts it thinks make summary judgment inappropriate. Again, the disagreements and additional facts must be supported with citations to admissible evidence. Local Rule 56. 1(b); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008). The Seventh Circuit has repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012); *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011); *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004).[2]

---

[2] The defendant's Local Rule 56.1 submission does not always identify the role or position of the main actors, and some key factual assertions are not supported by citations to evidence. For example, the defendants assert that "The Farbman Group first became aware of HCP after Andrew Gutman received an e-mail dated May 3, 2012 from the Farbman Group's broker, Jonathan Zimmerman, notifying him that HCP, through its broker, Michael Pink, was interested in leasing vacant office space at 205 W. Randolph." (*Defendant. Local Rule 56.1(a)(3) Statement of Undisputed Material Facts* ("*Def.St.*"), ¶ 8). As we shall see, these facts play a pivotal role in the parties' presentations. *See infra* at 14. But the defendants do not identify who Andrew Gutman is in their statement of facts or elsewhere in their opening brief. Moreover, he is not even identified in the excerpts from his deposition transcript. Reading the defendants' brief and statement

(continued...)

**II.**

**Factual Background**

**A.**

By the Spring of 2012, HCP was in need of new office space. One of the many spaces it had looked at in downtown Chicago was at 216 W. Jackson, which is owned and managed by the Farbman defendants. The space was available for sublease through 2014. HCP offered to sublease the space for the remainder of the lease term and then continue to lease it as a direct tenant without any requirement of additional improvements. On June 25, 2012, there occurred an exchange of emails critical to the parties' respective theories of the case. The background for those emails is set forth below.

On June 22, 2012, Harry Laws, of Bradford Allen[3], informed his colleague, Andrew DeMoss, who was the Farbman broker for 216 W. Jackson, that there was a party interested in subleasing the space occupied by Layered Technology at the Jackson Street property. (*Def.St.*, ¶ 15). Mr. DeMoss asked Mr. Laws if HCP was a "client services nonprofit," meaning "whether or not they have clients coming in and out of the space." (*Def.St.*, ¶ 17). Mr. DeMoss claims this was a concern because increased foot traffic meant increased wear and tear on the building. (*Def.St.*, ¶ 18).

On June 25th at 12:22 p.m., Mr. Laws, as agent for Layered Technologies, the tenant in the

---

[2](...continued)
of facts, one gets the impression that Mr. Gutman is – or at least was – the decision-maker at the Farbman Group. One does not actually learn that Mr. Gutman is the President of the Farbman Group until one reads it in the plaintiff's brief.

[3] As with Mr. Gutman, the defendants' Statement of Facts does not identify who "Mr. Laws" is or who he worked for or in what capacity. The deposition excerpt defendants cite refers merely to "Tad", leaving one to guess or assume that that is also Mr. Laws or Harry Laws.

space at 216 Jackson, emailed Mr. DeMoss,[4] informing him that the party interested in subleasing

the space "do[es] have clients visit their space. Let me know if that is an issue." (*Ex.* 17, HCP's

Opposition to Motion for Summary Judgment).[5]  The "subject line" of the email read: "**Subject**:

Housing Choice."[6]  DeMoss's answering email at 11:12 a.m. said: "Send me an email again with

the name [of the party interested in subleasing the space] and I will pass it on to ownership."  Again,

the Subject line was "Re: Housing Choice."  Laws immediately responded to DeMoss with the name

of the prospective sub-tenant, "<u>Housing Choice Partners</u>." (*Defendants. Ex.* 17)(Underlining in

original).

At 12:22 p.m., DeMoss emailed Mr. Gutman, President of the Farbman Group, regarding

"the Sublease at 216." Even though Mr. Law's email did not contain anything beyond the name of

the prospective sub-tenant (HCP), DeMoss wrote to Gutman:

> The brokers in our office working on the Layered Tech. sublease believe they have
> a subtenant ready to move forward. The subtenant would also be interested in a 2yr
> extension past the sublease expiration w/o needing any work.  After hearing *who* it
> is, I want to make sure the use would be acceptable before they move forward:
> Website: http://hcp-chicago.org/ hcp/

(*Ex.* 17)(underlining in original)(emphasis supplied).  The email did not explain what DeMoss knew

about HCP that caused him some apparent concern about "who" the prospective tenant was or how

he obtained the information.

At 12:50, Mr. Gutman, who had been provided no information by the DeMoss email about

---

[4] In his affidavit, Mr. Laws – who is called "Tad" throughout the parties' submissions – claimed that Layered Technology did not begin to look for subtenants until May of 2012.  (*Def. Ex.* C, ¶ 3).  In his deposition, he corrected himself, and conceded that it had been much earlier.  (*Pl. Ex.* 9, 55-56).

[5] Following the "Subject" line in the email heading appeared the words "Housing Choice."

[6] This refers to Housing Choice Partners or HCP.

HCP's business or clientele, sent this terse email to DeMoss: "Not a use for the building we would want." Curiously, Mr. Gutman testified at his deposition he didn't "know what that means." (*Defendant. Ex.* 6, at 107). While the defendants vehemently deny that there is any evidence proving Gutman accessed the HCP website appearing at the end of the DeMoss email, the circumstantial evidence admits of another interpretation. DeMoss's email expressed concern about "who" HCP was and how HCP would "use" the space. Mr. Gutman's response – it can be argued – reflects an awareness of HCP's operations, which he clearly did not learn from the DeMoss email. But if he didn't look at the website, where did the information come from? To raise the question is not to answer it, but simply to demonstrate that there are disputed issues of fact about what Gutman knew, how he knew it, and whether what he knew animated his summary rejection of HCP. But even if one were to conclude that Gutman did not look at the HCP website *in June*, the evidence shows that he knew something about HCP, and that he had at least twice been provided with HCP's website address a month earlier in May when HCP was attempting to lease space at another Farbman property at 205 W. Randolph. (*Motion for Summary Judgment* at 7). Indeed, the Farbman defendants have admitted that Gutman "was aware of HCP from the negotiations at 205 W. Randolph,"and Gutman claimed at his deposition that on June 25, HCP was an "active prospect over at 205." (*HCP's Sur-Reply*, *Answer to Interrogatory* No. 4; *Defendant. Ex.* 5 at 107).

Thus, the defendants themselves have made irrelevant any discussion of whether HCP's anticipated or actual "use" of its space played a part in Mr. Gutman's thinking at the time he wrote the email rejecting HCP as a sublessee. However, the defendants' *volte face* is relevant to HCP's arguments regarding pretext and motivation, for shifting explanations for a decision can call into question the credibility of the proffered explanation. *Jones v. A.W. Holdings LLC*, 484 Fed.Appx.

44, 48-49 (7th Cir. 2012).

At his deposition, Mr. Gutman testified that he does not recall going to the HCP website when it was provided by DeMoss. (*Defendant. Motion For Summary Judgment* at 6). But apart from that answer leaving the matter indeterminate, this was not Mr. Gutman's first awareness of the HCP website. As noted above, in early May 2012, approximately a month before attempting to lease space at 216 W. Jackson, HCP had expressed interest in leasing space in the Farbman Group's building at 205 W. Randolph. (*See Defendant. Ex* A-B). On about May 3, 2012 Mr. Gutman received an email from Jonathan Zimmerman of Willard Jones Real Estate indicating that HCP was interested in leasing Suite 1040 at 205 W. Randolph *and providing HCP's website*. *(Defendant. Ex. A)*. On May 15, Mr. Gutman received another email from Zimmerman *again providing HCP's website*. In short, as the defendants have conceded, Mr. Gutman was aware of HCP a month before the rejection by Mr. Gutman on June 25. *(See HCP* Surreply *to the Farbman Defendants' Reply*, Ex. 2, Answer of the Farbman Group to Interrogatories 4, 5 and 6.).[7]

The website is revealing. It contains five pictures immediately below the title "Housing Choice Partners, Working for Better Housing Solutions." The first and third pictures are of two African-American children. The defendants argue that the pictures are not prominent. *(Defendant. Response to HCP's Statement of Additional Facts, Additional Fact* 3). The jury could quite clearly find otherwise as they are impossible to miss. The other pictures are of different kinds of housing. Below the line of pictures is an eight-paragraph explanation "About HCP." The website states, in

---

[7] The Layered Technology space at 216 W. Jackson had been on the market as early as February 2012, (*Plaintiff's Response to Def.St.*(*Pl.Rsp.*), ¶ 12, Ex. 9, 55-56), and not merely from May 2012 as the defendants have asserted in their motion for summary judgment. Bradford Allen showed the space to various prospective subtenants. The Farbman Defendants were, at that time, unaware that one of them was HCP, which took a walkthrough on May 29, 2012. (*Def.St.*, ¶¶ 13-14; *Pl.Rsp.*, ¶¶ 13-14).

10

part, that HCP:

> was founded in 1995 by metropolitan area fair housing organizations. Advocates were concerned about the concentrations of poverty and race that had developed in the suburban rent subsidy program (then called Section 8).

> HCP was created to operate a new ground-breaking program to provide expanded housing choice to families in concentrated areas. The idea was to encourage access to opportunity areas for low-income families.

http://hcp-chicago.org/. *See* HCP's Opposition to the Farbman Defendants' Motion for Summary Judgment, Ex. 2.).[8]

The website went on to explain that HCP had expanded its work to provide counseling to Chicago Housing Authority residents relocated through the CHA's "Plan for Transformation", through Good Neighbor Workshops addressing topics like home maintenance and financial management. *Id.* The phrase "low income families" or "low income residents" appears rather clearly in the description of HCP's activities, which also includes references "to promote diversity" and "neighborhood inclusion." Finally, the website noted that HCP is a HUD-approved counseling agency. And, under the heading "**LINKS**" are the names of eight well-known entities, including the CHA, Chicago Area Fair Housing Alliance, HOPE Fair Housing Center, Poverty and Race Research Action Council, Illinois Housing Development Authority and HUD. A jury could find that anyone reading the website, especially a sophisticated real estate professional like Mr. Gutman, would realize that HCP catered to a largely poor and minority clientele.

---

[8] The defendants do not contend that Ex. 2 is inadmissible because it purports to reflect the HCP website on December 6, 2012, rather than in May and June 2012. In fact, the defendants almost implicitly concede that the screen shot (Ex. 2) accurately reflects the website in May and June. (*Motion for Summary Judgment* at 7). The response to Additional Fact 4 which contends that approximately 88% of individuals serviced by HCP are African American is that two people affiliated with HCP did not know this. But for purposes of the instant motion, these are quibbles, which do not affect the outcome of the case.

While Mr. Gutman claimed at his deposition that he could not recall whether he visited the website after receiving the June email, that simply leaves the matter indeterminate, and a jury, based on the evidence, could conclude the opposite. Perhaps he visited the website then. Perhaps he never visited the website at all. But this is a question for the jury.[9]

Further evidence demonstrates the existence of disputed issues of material fact. According to the Gutman email, HCP was rejected because of its anticipated "use" of the space. But it is undisputed that there were other tenants at 216 W. Jackson who, like HCP, could reasonably be characterized as "client-services based companies." (*The Farbman Defendants' Response to HCP's Statement of Additional Facts*, at 15, Response to Additional Fact 37). And more importantly the defendants have now switched positions on the "use" question and represent that notwithstanding the literal text of Mr. Gutman's email of June 25, they will not be raising any defense based upon HCP's usage of the space or the amount of traffic brought to the building on account of HCP's business operations. And they have also stipulated that they will not argue that potential tenants at 216 W. Jackson were rejected due to the nature of their business, use, amount of traffic, or number of visitors. (*Defendant. Stipulation of Undisputed Facts, ¶ 6; Plaintiff's Statement of Additional Facts*, ¶ 18). Indeed, they concede that no tenant has ever been rejected at 216 W. Jackson on the basis of the nature of their business, use, amount of traffic, or amount of visitors. (*SOF* ¶¶ 6, 30-31; Ex.1 ¶6).

---

[9] There are statements in emails stating that DeMoss said Gutman had looked at the website. But these statements are hearsay and inadmissible. *Fed.R.Civ.P. 56(c)(2); Cortezano v. Salin Bank & Trust Co.,* 680 F.3d 936, 942 (7th Cir.2012).

**B.**

A key feature of the defendants' motion for summary judgment involves the unsuccessful efforts by HCP to rent space in early May at 205 West Randolph. (Defendant. Exs. A, B, H). It is the defendants' current contention – having abandoned any claim that excessive foot traffic by HCP's clientele underlay its rejection as a sublessee at 216 West Jackson – that Mr. Gutman turned down HCP's request to become a sublessee at the Jackson Street property in late June because he preferred that HCP fill a vacancy at the Randolph Street property as a new tenant, rather than as a sublessee at the Jackson Street property. (*The Farbman Defendants' Response to HCP's Statement of Additional Facts, Additional Fact* 17) [#82]; (*Def.Ex.* G, at 89-91). And, Mr. Gutman's took that position at his deposition.[10]

Mr. Gutman, however, claimed to have no recollection whether he informed anyone of his plan to place HCP in a new lease at 205 W. Randolph, (*Pl.Ex.* 5, at 105-07), and that reason was never communicated to HCP or its broker. Nor did Mr. Gutman make any effort to have anyone from the Randolph Street property follow through with HCP, following the June 25th rejection.

To show the incongruity of the plaintiff's claim of discrimination in June, the defendants argue that despite having access to the HCP website in May, Gutman "approved" HCP as a tenant at the 205 Randolph building in early June. And if that be true, he would not, it is argued, have rejected HCP's application for a sublease at the Jackson Street property in late June. In support of this argument, the defendants assert that "[o]n or about June 7, 2012, The Farbman Group approved a proposal for HCP to rent space at 205 W. Randolph." (*Def.St.*, ¶ 10). The contention appears to

---

[10] The defendants have conceded that they are not aware of any other potential tenant that expressed an interest in subleasing the space at 216 Jackson Street that was rejected on the basis that the Farbman Group preferred it lease space at the 205 Randolph building. (*Defendant. Stipulation of Undisputed Facts*, ¶ 7).

be based on a June 7, 2012 "proposal" from Zimmerman of Willard Jones Real Estate to Mr. Pink, setting forth proposed terms for HCP to lease Suite 1040 at 205 W. Randolph. (Defendant. Ex. B).[11]

If the defendants had approved HCP as a tenant at 205 Randolph, the argument would go far towards refuting the idea that there was a discriminatory motive behind the rejection on June 25th of HCP as a sublessee at 216 Jackson. The problem, however, for present purposes, is that the evidence is not conclusive. Here are the facts based on the current record.

On May 3, 2012, Zimmerman sent Gutman an email telling him of HCP's interest in Suite 1040 at the Randolph Street property. He asked Gutman for permission to proceed with a space plan. He told Gutman HCP was looking for a five-year lease with an August 1 occupancy. (*Defendant. Ex* A). Two weeks passed with no answer from Gutman. On May 15, Zimmerman again emailed Gutman, asking if he had gotten pricing on the construction in Suite 1040 since the prospective tenant was formally requesting a proposal that afternoon. (*Ex. H*). This email also showed had the HCP website. That same day, Gutman responded: "We will price. thanks".

Two weeks passed without word from Gutman. Zimmerman again made inquiry on May 30 and then on June 5 regarding the pricing. On June 5, Gutman apologized for having left Zimmerman "off the loop" and instructed him to "propose turnkey." On June 7, Mr. Zimmerman, on behalf of 205 West Randolph Building and Randolph Acquisition LLC, sent Gutman the "proposal" to HCP for a 5-year 4-month lease commencing August 1. The email ended "please let me know if you approve." (*Def.St.*, Ex. B, H).

---

[11] Under the terms of the proposal, neither party would be bound until a number of conditions had been satisfied.

On June 29, five days after Gutman had rejected HCP as a sublessee at 216 W. Jackson, Zimmerman emailed Gutman referring to HCP and again providing the HCP website. The email said that HCP had been negotiating a sublease at 216 Jackson and that HCP had been rejected because its "use not being acceptable [to the landlord]." Gutman of course knew that. Zimmerman asked whether, "[g]iven Farbman Group's involvement at 216 W. Jackson, would the same would hold true at 205 W. Randolph?" The email concluded by saying that HCP would like to work out a deal "if you are willing. Please let me know." (*Defendant Ex.* H). A few minutes later came Gutman's answer: "Interesting isn't it. We would of course welcome them at 205 W. Randolph." Zimmerman then emailed Pink saying he spoke with the ownership at 205 Randolph and they would be happy to have HCP as a tenant. (*Defendant. Ex.* H).

## C.

As discussed above, the defendants' motion for summary judgment is based on the contention that Mr. Gutman had no idea what the racial composition of HCP's clientele was, and that he had "no interest in that information." (*Motion for Summary Judgment*, at 6). But, we must draw all reasonable inferences in HCP's favor, *Coleman v. Donahoe,* 667 F.3d 835, 842 (7th Cir.2012); *Duable Mfg. Co. v. U.S. Dep't of Labor*, 578 F.3d 497, 501 (7th Cir.2009), and Mr. Gutman's assertions need not be accepted at face value if other evidence calls those assertions into question.

As we have seen, Mr. Gutman had been given HCP's website twice in May and then again in June by DeMoss and Zimmerman. The only photos of individuals on the website are of two African American children. One does not have to read far to learn that the organization handles minority subsidized housing residents. Anyone even vaguely familiar with Chicago's demographics

15

would leave the site with the impression that HCP was serving a mostly African-American clientele. Is it plausible that the President of a major real estate management firm with 20 years of experience in the real estate business and asked to approve an offer of a 5-year lease would not look at the applicant's website before approving the proposal? The jury, of course, will be called upon to assess all the evidence bearing on the question and to use its common sense and human experience.

The defendants cannot obtain summary judgment merely by repeating in their submissions that there is no evidence that Mr. Gutman was aware of the racial composition of the people HCP served or that he saw the websites. To be sure there is no direct evidence that he saw HCP's website. But knowledge and intent, of course, can be proved by circumstantial evidence. *See supra* at 2-3 and *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008); *Ridings v. Riverside Medical Center*, 537 F.3d 755, 774 (7th Cir. 2008).

The defendants also point out that there are other "non-profits" or "client-services based companies" at the 216 W. Jackson building, and their Exhibit U contains screen shots of the website of what purport to be the website of Jewish Children and Family Services and Jewish Vocational Services. The screen shots included in Exhibit U are replete with pictures of African-American Children and adults. Indeed, there are more than 50 such photographs.[12]

The defendants point out that the Chair of the HCP Board and her fellow Board members claim never to have seen these photographs – just as Gutman claims never to have seen HCP's website – even though produced by HCP's counsel and even though the photographs would seem

---

[12] Other client-service based, non-profit organizations lease space at the 216 W. Jackson building. They are the Jewish Federation of Metropolitan Chicago, Jewish Vocational Services, and Verve, Inc. d/b/a Jack Morton Training. Since it acquired 216 W. Jackson in September 2007, Defendant 216 Jax has extended the lease of Jewish Federation of Metropolitan Chicago, entered into a new lease and subsequent extensions with Jewish Vocational Services and entered a lease extension and expansion of space with Jack Morton. (*Plaintiff's Statement of Additional Facts*, ¶ 37-39).

16

to show that JCFS provides substantial services to African-Americans. (*Defendant. Motion for Summary Judgment* at 9). Another tenant at 216 W. Jackson is SOS Children's Villages, Illinois, a nonprofit organization providing viable alternatives to traditional foster care. The photographs on the SOS website depict African-American families. (*Defendant. Ex. W*). In the plaintiff's view, Exhibit U is misleading since it claims it takes substantial effort navigating the sites before one comes across pictures of African-Americans.

Presumably, the point of the presentation was to show that the defendants had no racial animus and thus would not have rejected HCP for some illicit reason. But these are arguments more fitted for trial than for summary judgment. What is clear beyond peradventure of doubt is that genuine issues of disputed material fact abound. Perhaps, when all the evidence is assessed, a jury will find that it was unlikely that the defendants would have chosen to discriminate against HCP. Or, perhaps it will come to a contrary conclusion. It is both improper and premature to hazard a guess.

The remainder of the Farbman defendants' arguments are not persuasive. For example, they argue that the two children pictured on the HCP website are not HCP clients, but children of one of an HCP employee. (*The Farbman Defendants' Motion for Summary Judgment*, at 7). While true, the point is irrelevant. Consanguinity has nothing to do with the impression and message the reader takes away from even the most casual glance at the site: African Americans are the demographic with which HCP has a special concern.[13]

---

[13] It is as if to say that a website depicting a courthouse and a person in judicial robes would not leave the impression that a judge wore robes or worked in a courthouse because the person was a model.

Mr. Pink testified that it was "never made clear to" him that the clientele of HCP is "only African American." (Defendant. Ex. R, at 105). Ms. Young testified that she did not know the exact percentage of HCP African American clientele, but she "assume[d] that it's more than 50" although she didn't know that for a fact. (Def.Ex. M, at 52). But it is inconsequential whether HCP's clientele is is "only African American" or even that it is predominantly – 88% –African American. The question is whether Mr. Gutman's had a perception that HCP served some percentage of African Americans and whether that perception lead him to summarily reject HCP as a prospective sublessee/lessee in his June email.

### D.

As discussed earlier, the Farbman defendants submit that it makes no sense to say that Mr. Gutman had a discriminatory motive for rejecting HCP in late June since he previously approved it as a lessee at the 205 W. Randolph building weeks earlier. The evidence is not conclusive, and events in July 2012 bear on that question, without conclusively resolving it in the defendants favor.[14]

On July 10, 2013, two weeks after HCP was rejected by Gutman for the 216 W. Jackson space, Mr. Pink, HCP's broker, emailed Jonathan Zimmerman, the Farbman Group broker, with a counter-offer (to the June 7 proposal) on Suite 1040 at 205 W. Randolph. (*Defendant. Ex* H, J). The same day, Mr. Zimmerman sent HCP's counter-offer to Mr. Gutman, stating: "[i]f you approve [HCP] is ready to begin negotiating a lease." (*HCP's Opposition to Motion for Summary Judgment,*

_____

[14] The post-June 29th evidence involving HCP and the 205 W. Randolph property is relevant under Rule 404(b), Federal Rules of Evidence, to ascertaining Mr. Gutman's intent regarding HCP's attempt to sublease the Laser Tech space at the 216 West Jackson building. That the events are subsequent to that rejection is of no moment since by its very terms Rule 404(b) does not distinguish between prior and subsequent acts. *United States. v. Savage*, 505 F.3d 754, 761 (7th Cir.2007);*United States v. Perry*, 438 F.3d 642, 647 (6th Cir. 2006); *Ansel v. Green Acres Contracting Co., Inc.*, 347 F.3d 315 (3rd Cir. 2003). Admissibility of subsequent acts depend on their relevancy, not their chronology. *See* 2 Weinstein's Evidence § 404[12] at 404-94 (1986).

Ex. 30; Defendant Ex. J).

On July 10th at 9:20 p.m., Mr. Gutman wrote to Zimmerman:

Jonathan:

We should look at another suite for them if they are still interested. We have a friends family deal we are working on for [Suite] 1040 currently with a colleague of Andy Farbman's [the CEO of the Farbman Group].

(*Pl.Ex*. 30; Def. Ex H, J).   The prospective tenant was apparently Printable Promotions. (*Def. Response to HCP's Statement of Additional Facts, Response to Additional Fact 36*).

Mr. Gutman testified that between June 29, 2012 – when Mr. Zimmerman told Mr. Pink that HCP was rejected for the 216 W. Jackson property – and July 10th – when he told Mr. Zimmerman that the 205 W. Randolph space was the subject of a "friends family deal"involving a colleague of the Farbman Group's CEO – and thus unavailable -- he had no recollection of any specific negotiations regarding that deal.  (*Pl.Ex*. 5, at 126-131). To fill this gap, the defendants' reply brief includes an affidavit from Mr. Gutman in which he says that in the period from June 29th through July 10th, Andy Farbman may have been conducting negotiations privately with the prospective tenant purportedly interested in Suite 1040, in connection with the "friends family deal." (*Def.Ex*. DD, ¶ 10). This is speculative and thus inadmissible.  Moreover, the Farbman Group's counsel conceded at Gutman's deposition that there was no post-June 21 documentary evidence relating to that deal, thereby further undercutting Mr. Gutman's belated affidavit, and perhaps the excuse, itself. (Pl.Ex. 5, at 131).  But these are issues of credibility for the jury to resolve. *Pagel v. TIN Inc*., 695 F.3d 622, 628 (7th Cir. 2012); *Stokes v. Bd. of Educ. of Chi.,* 599 F.3d 617, 619 (7th Cir. 2010).

On July 23rd, Zimmerman again inquired of Mr. Gutman whether there were any new developments with Suite 1040 since HCP was "still interested." (*Pl. Ex. 30*). Mr. Gutman's response

was: "let's find a different space for them please." (*Pl. Ex. 30*). Mr. Zimmerman responded that he was uncertain if there was such a space unless they subdivided the 19th floor "which would be a lot of money." Mr. Gutman replied: "there is always another location! I believe in you." (*Ex.* 30). There followed emails regarding possible alternatives to Suite 1040, with Mr. Gutman ultimately suggesting Suite 1150. Mr. Zimmerman pointed out that Suite 1150 was almost 1000 square feet smaller than HCP needed. Mr. Gutman laconically responded, "Ok." (*Ex.* 30).

All this evidence is susceptible of two competing interpretations, one favorable to the defendants, the other supportive of the plaintiff's theory of the case and arguably showing that Gutman had never really approved HCP as a tenant at the West Randolph property as is now claimed and that his post-June 29 conduct regarding Suite 1040 proves it. But this is a matter for the jury.[15]

On July 23, Mr. Pink inquired of Zimmerman regarding the status of the friends and family deal with Andy Farbman. More than a month later, on August 30, Zimmerman responded and informed Pink that the deal the owner of 205 W. Randolph was working on for Suite 1040 "apparently now is off" and asking whether HCP had found space. (*Ex.* K). It had, at 401 S. LaSalle.

### E.

All this is not to say that HCP has the better case, or vice versa. It is simply to say that there are genuine issues of material fact making summary judgment improper, and *a fortiori* Rule 11 sanctions, which the defendants have asked for on the basis of there not " being a single piece of evidence to support [HCP's] claim." [Dkt. #76, at 1].

---

[15] The defendants' reply brief includes an affidavit from Mr. Gutman in which he claims that Pioneer Futures had visited the 216 W. Jackson space by June 6th and had submitted a written proposal by June 29th. (Def.Ex. DD, ¶¶ 9). But this comes too late.

In addition, review of the parties' summary judgment submissions counsels that HCP's motion to compel [Dkt. # 47] as the Farbman Group's opposition to that motion [Dkt. # 51] is based on their stance regarding the lack of any basis for HCP's claims. The discovery HCP seeks is relevant to its claims and the Farbman Group's defenses. Indeed, it covers the written proposal from the "friends and family" tenant that the Farbman Group's attorney had previously stated did not exist. [Dkt. # 51, at 7]. While the Farbman defendants complain that the discovery sought is overly broad and ask that it be pared down, they do not suggest what it might be pared down to. The parties are encouraged to meet and confer on the topic in light of this opinion.

## CONCLUSION

"The drawing of inferences, particularly in respect to questions of knowledge and intent are generally peculiarly within the province of the fact finder who observed the witnesses. It is for that reason that a district court should resist drawing inferences regarding questions of knowledge and intent on summary judgment, where the conduct of the parties is subject to varying reasonable interpretations and motive and intent are rarely susceptible to resolution at the summary judgment stage. *Watts v. United Parcel Service,* 378 Fed.Appx. 520, 530 (6th Cir. 2010); *Justofin v. Metropolitan Life Insurance Co.*, 372 F.3d 517, 524 (3rd Cir. 2004); *Katz v. Goodyear Tire and Rubber Co.*, 737 F.2d 238, 244 (2nd Cir. 1984). This is not to say that summary judgment is unavailable where issues of intent predominate or where discrimination is alleged. It is not. *See, e.g., Mills v. First Federal Sav. & Loan Ass'n of Belvidere,* 83 F.3d 833, 846 (7th Cir.1996); *United Ass'n of Black Landscapers v. City of Milwaukee,* 916 F.2d 1261, 1263 (7th Cir.1990). However, in this case there are genuine issues of material fact, and therefore the defendants' motion for summary judgment [Dkt. # 71] is DENIED. The permission in the order of 8/12/13 [85] for the plaintiff to

refile its motion for sanctions is withdrawn. The plaintiff's motion to compel discovery [Dkt. # 47] is GRANTED.

ENTERED: _____
                   UNITED STATES MAGISTRATE JUDGE

DATE: 9/6/13